UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

REGINE LIFRANC,

      Plaintiff,

  - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION and DR. DAVID MORRIS,

      Defendants.

---------------------------------------X

**MEMORANDUM & ORDER**

07-CV-1109 (KAM) (LB)

**MATSUMOTO**, UNITED STATES DISTRICT JUDGE:

      Plaintiff Regine Lifranc ("plaintiff" or "Lifranc")
brings this action against the New York City Department of
Education ("DOE") and Dr. David Morris ("Morris") alleging
employment discrimination and retaliation on the basis of her
race, gender,[1] and national origin in violation of Title VII of
the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et
seq.* ("Title VII"); the Fourteenth Amendment to the United
States Constitution; 42 U.S.C. § 1983; New York State Human
Rights Law, Executive Law §§ 290 *et seq.* ("NYSEL"); New York

---

[1]    Although the Second Amended Complaint does not assert a claim of
discrimination based upon gender, plaintiff asserted that she was
discriminated against based on gender in her deposition and both plaintiff
and defendants address this claim in their briefs on the instant motion.
(See Doc. No. 50, Defendant's Memorandum of Law in Support of Motion for
Summary Judgment ("Def. Mem."); Doc. No. 41, Memorandum of Law in Opposition
to Motion for Summary Judgment ("Pl. Mem."); Doc. No. 52, Defendant's Reply
Memorandum in Support of Motion for Summary Judgment ("Def. Reply Mem.").)
Accordingly, the court considers plaintiff's Second Amended Complaint amended
to include a gender discrimination claim.  See Fed. R. Civ. P. 15(c)(1)(B)
(permitting relation back of claims arising "out of the conduct, transaction,
or occurrence set out – or attempted to be set out – in the original
pleading").

City Human Rights Law, Administrative Code § 8-101 *et seq.*
("NYCHRL") and Article V, § 6 of the New York State
Constitution. (*See generally*, Doc. No. 13, Second Amended
Complaint ("Second Am. Complaint" or "SAC") ¶ 1.) Plaintiff
alleges that she was discriminated against because of her race,
gender, and national origin and retaliated against for
registering a formal complaint with the National Association for
the Advancement of Colored People ("NAACP") when her duties as
an Assistant Principal of Beach Channel High School ("Beach
Channel") were removed on March 6, 2006 and her position as a
probationary Assistant Principal was later discontinued. (See
SAC ¶ at 11-26.)

After completing discovery, defendants move for
summary judgment and seek dismissal of plaintiff's action
pursuant to Federal Rule of Civil Procedure 56. (See Def. Mem.;
Pl. Mem; Def. Reply Mem.) For the reasons set forth below,
defendants' motion is granted and plaintiff's Complaint is
dismissed in its entirety.


**FACTUAL BACKGROUND**

The facts pertinent to this motion, either undisputed
or, where disputed and supported by competent evidence, taken in
a manner most favorable to plaintiff, are as follows.

**A. Plaintiff's Assignment as an Assistant Principal at Beach Channel and Performance Prior to the 2005-2006 School Year**

Lifranc began working at Beach Channel High School in 1996. (See Doc. No. 45, Affidavit of Harvey S. Mars, Esq. ("Mars Aff.") Ex. 4, Deposition of Regine Lifranc, August 19, 2008 ("Lifranc Dep.") at 12-13.)  In 2001, Lifranc became a probationary Assistant Principal of Guidance, or Pupil Personnel Services, at Beach Channel responsible for supervising the guidance counselors and ensuring that students' social, emotional and academic needs were met.  (Id.; see also Mars. Aff. Ex. 7, Deposition of Rose DePinto, November 10, 2008 ("DePinto Dep.") at 12.)  The probationary period for Assistant Principals is five years and Lifranc's probationary period was scheduled to conclude on September 1, 2006.  (See Doc. No. 44, Affidavit of Regine Lifranc ("Lifranc Aff.") at ¶¶ 2-3, Ex. 1, Notice of Appointment dated 3/8/2002.)

While employed at Beach Channel, Lifranc had never received any disciplinary notices or been reprimanded in any way prior to the 2005-2006 school year.  (Lifranc Aff. ¶ 12.)  Prior to the 2005-2006 school year, Lifranc had received ratings of "Satisfactory" on each of her annual Pedagogical Supervisory Personnel Reports ("Rating Sheets").  (See Lifranc Aff. ¶¶ 5-8, Exs. 2-5.)  Specifically, previous Beach Channel principals Bernard Gassaway and John Marcus rated Lifranc's performance as

"Satisfactory" for the 2001-2002 and 2002-2003 school years, respectively. (See id.)

Morris became principal of Beach Channel in November 2003. (See Mars Aff. Ex. 5, Deposition of Dr. David Morris, April 30, 2008 ("Morris Dep.") at 7.) Morris rated Lifranc's performance as "Satisfactory" for both the 2003-2004 and 2004-2005 school years. (See id.) During those years, Morris also wrote several letters to Lifranc's personnel file praising her and thanking her for her performance of various tasks such as planning a memorial service, an open house, and an honor roll ceremony for the Beach Channel community. (See Morris Dep. at 84-95.) Lifranc believes that Morris fairly evaluated her and did not discriminate against her in a prior evaluation and when writing praiseworthy letters to her personnel file. (See Lifranc Dep. 84-86.) Morris first told Local Instructional Superintendent Roz German ("German"), the Regional DOE official with power to hire and fire assistant principals, that he was concerned about Lifranc's work performance as early as the beginning of 2005. (See Mars. Aff. Ex. 8, Deposition of Roz German, July 15, 2008 ("German Dep.") at 17, 50-52.)

In or around October 2004, Lifranc and the guidance counselors she supervised raised a variety of issues and concerns involving school policies and procedures and communication between departments that prompted a meeting with

4

Morris to discuss the problems. (Plaintiff's 56.1 Statement ("Pl. 56.1") ¶ 6; Lifranc Aff. ¶ 9.) Morris further responded to the concerns raised by the Guidance Department by letter dated October 14, 2004. (Id.; see also Lifranc Aff. Ex. 6, Morris 10/14/04 Ltr.) By letter dated October 18, 2004, Lifranc responded to Morris's 10/14/04 letter and complained of a "somewhat hostile environment" she was experiencing due to a lack of communication with another school department headed by another Assistant Principal, Robert Brevetti ("Brevetti"). (Pl. 56.1 ¶ 7; see also Lifranc Aff. Ex. 7, Lifranc 10/18/04 Ltr.)

**B. The December 16th Assessment and Subsequent Disciplinary Actions**

**a. The Best Practices Assessments Generally**

The DOE Office of School Intervention and Development ("OSID") was led by Rose DePinto ("DePinto"), a Senior Counselor to the Chancellor responsible for the safety and security of more than 1,300 DOE schools. (DePinto Dep. 10-13.) As part of its focus on school safety and security, OSID conducted assessments of high schools approximately twice per year based on a best practices rubric ("Assessments"). (See DePinto Dep. at 28.) The Assessments were scored on a scale of 1-3, with a score of "1" meaning that the school does not meet the applicable standard, a score of "2" meaning that the school is

approaching the standard, and a score of "3" meaning that the school meets the standard. (DePinto Dep. at 30-31.)

According to DePinto, the purpose of the Assessments was to identify the strengths and weaknesses of a school, make recommendations according to established best practices, and permit the principal to create an action plan for addressing and improving identified areas of weakness based on the Assessment. (DePinto Dep. at 23, 46.) DePinto stated that she did not specifically know "what a principal would do" based on the Assessments, and that she "never had a discussion about using [the Assessments] as an evaluation of Principals or Assistant Principals. That was not the purpose." (DePinto Dep. at 46-47.) DePinto further stated that "to [her] knowledge" the assessments were not used for disciplinary purposes (DePinto Dep. at 24), and that the Assessments were "not evaluative" (DePinto Dep. at 46). DePinto explained that by "not evaluative" she meant that she "was not evaluating Principals or Assistant principals based on these assessments. That was not my role." (DePinto Dep. 46-47.)

### b. The December 16th Assessment at Beach Channel

As it had in the past, on December 16, 2005, the OSID conducted an assessment of Beach Channel ("December 16th Assessment") which focused on best practices in three inter-related areas: (i) safety and security; (ii) pupil personnel

6

services; and (iii) teaching, learning, and instruction. (See DePinto Dep. at 9-13, 29.) In connection with the December 16th Assessment, the OISD team visited Beach Channel and interviewed stakeholders including students, teachers, custodians, school safety agents, the parent coordinator, and the principal. (DePinto Dep. at 21-22.)

DePinto participated in the December 16, 2005 Assessment at Beach Channel along with other members of her team. (DePinto Dep. at 10-13, 29.) Although Pupil Personnel Services, for which Lifranc was responsible, had also been evaluated during previous assessments in May 2004, January 2005, and May 2005, it is unclear whether DePinto had been personally involved in any previous assessment at Beach Channel. (Pl. 56.1 ¶ 8; see also DePinto Dep. 29-30.)

During the December 16th Assessment, however, DePinto personally evaluated Pupil Personnel Services along with another DOE official, Marjorie Elliott ("Elliott"), the Director of the Office of Student Placement for Youth and Family Support Services. (DePinto Dep. at 11, 42; see also Lifranc Aff. Ex. 11, Letter from Marjorie Elliott dated 2/13/06 ("Elliott 2/13/06 Ltr."); Chiu Decl. Ex. I, Lifranc 2/14/06 Ltr.) Prior to the December 16th Assessment, DePinto and Morris had never discussed Lifranc's job performance. (DePinto Dep. at 52.) Pupil Personnel Services received an average score of 1.5 on the

December 16th Assessment.[2]  (Pl. 56.1 ¶ 8.)  Previously, Pupil

Personnel Services had received average scores of 1.37 on a May

12, 2004 Assessment, 2.2 on a January 19, 2005 Assessment, and

2.4 on a May 24, 2005 Assessment.  (Id.; Lifranc Aff. ¶ 11, Ex.

8.)

        DePinto testified that based on their observations

during the December 16th Assessment, the OISD team was

especially concerned with the failure of the guidance counselors

at Beach Channel to follow up with students and develop

intervention plans for students showing serious behavioral

issues.  (DePinto Dep. at 34-35.)  Specifically, the December

16th Assessment found that guidance staff under Lifranc's

leadership failed to "stay on top of students in need of

additional support and interventions" and had "no mechanisms" in

place to case conference around such students, and that no

evidence showed that members of the Pupil Personnel Team were

serving as advocates for students or liaisons to families in the

suspension process.  (See Lifranc Aff. Ex. 8, Beach Channel High

School Best Practices Rubric Longitudinal Progress, Pupil

Personnel Services ("December 16th Assessment Rubric").)

Additionally, the December 16th Assessment noted that the Pupil

Personnel Services mechanisms for tracking student progress and

---

[2]     Defendants calculate the average score for Pupil Personnel Services on
the December 16th Assessment as 1.4.  (See Defendants' 56.1 Statement ("Def.
56.1").)

programming needed "much attention" and that Lifranc needed to conduct additional training with her guidance staff.  (<u>Id.</u>)

### c. Disciplinary Actions Involving Lifranc Following the December 16th Assessment at Beach Channel

On February 7, 2006, after the December 16th Assessment was issued, Lifranc received a disciplinary letter dated February 1, 2006 from her principal, the defendant Morris, directing her to address the deficiencies identified in the Assessment.  (<u>See</u> Lifranc Aff. Ex. 9, Morris 2/1/06 Ltr.) Specifically, Morris directed Lifranc to, among other things, create a guidance plan, help students make yearly progress towards meeting promotion standards, work with the Parent Coordinator to facilitate delivery of suspension-related services, work with Brevetti to coordinate programming and attendance outreach, and regularly send notices to parents about school events and schedules.  (<u>See</u> <u>id.</u>)  Lifranc was given a month to implement the required corrections outlined in Morris's 2/1/06 letter.  (<u>See</u> German Dep. at 92.)

Also on February 7, 2006, Lifranc submitted a letter to Morris objecting to the placement of the Morris 2/1/06 Letter in her file, and disputing the accuracy of the December 16th Assessment.  (<u>See</u> Lifranc Aff. Ex. 10, Lifranc 2/7/06 Ltr.) Lifranc's February 7th letter questioned how it was possible for the Pupil Personnel Services score to decline from an average

score in the "2" range to an average score in the "1" range during a seven month period since the pervious Assessment when all departmental procedures had remained the same. (Id.)

Lifranc's February 7th letter also questioned DePinto's ability to be an impartial evaluator of Lifranc's performance. (Id.) Specifically, Lifranc asserted that DePinto had "expressed and shown her displeasure" towards Lifranc since the fall of 2002 because DePinto was upset that Lifranc had hand-delivered a letter to Chancellor Joel Klein at that time complaining about a former Beach Channel principal.[3] (Id.; see also Lifranc Dep. at 83.) In her letter, Lifranc also stated that she was "determined more than ever to [continue to] work with" Morris and noted that Morris himself had "many different occasions" commented on how hard Lifranc has been working at Beach Channel. (Lifranc 2/7/06 Ltr.)

Elliott also sent a letter dated February 13, 2006 to Lifranc regarding the December 16th Assessment. (Lifranc Aff. ¶ 14, Ex. 11, Elliott 2/13/06 Ltr.) In her letter, Elliott further detailed the results of the December 16th Assessment, "reiterate[d]" the conversations Elliott had had with Lifranc at Beach Channel during the December 16th Assessment, and "reminded" Lifranc of a number of recommendations for improving Lifranc's performance. (Elliott 2/13/06 Ltr.) Among other

---

[3]     DePinto testified that she had no recollection of any occasion where Lifranc hand-delivered a letter to the Chancellor. (See DePinto Dep. at 48.)

things, Elliott reminded Lifranc that Lifranc needed to personally utilize professional development opportunities offered by OSID as well as to provide professional development to her staff to ensure adequate programming for students and delivery of mandated services to students in need, outreach to parents of chronically disruptive students, service as advocates for students in the suspension process, and lesson presentations in classrooms. (Id.) Elliott also noted that "based on my observations and your responses during our conference" with DePinto during the December 16th Assessment, "I must conclude that your performance to date . . . has been unsatisfactory," and advised Lifranc that "continued unsatisfactory performance could result in an unsatisfactory rating." (Id.) Although one of the three prior assessments of Pupil Personnel Services was worse than the December 16th Assessment, Elliott had "never [before] submitted a disciplinary letter [to Lifranc] concerning the results of the assessments." (Lifranc Aff. ¶ 14.)

In the month following the Morris 2/1/06 Letter, German continued to monitor Lifranc's performance and the functioning of her department by means of regular school visits. (German Dep. at 92-95.) However, German did not see any improvement in Lifranc's performance during this time. (Id.) On March 6, 2006, Lifranc's responsibilities over Beach Channel's Guidance Department were removed. (See id. at 54-55.)

Both Morris[4] and German testified that they were responsible for the decision to transfer Lifranc's duties. (Morris Dep. at 159; German Dep. at 35-38, 54-57.)

On March 25, 2006, while Lifranc was out on disability leave,[5] she received a packet from Morris enclosing four letters from Morris to Lifranc for her file ("Morris March Letters").[6] (See Doc. No. 51, Declaration of Daniel Chiu, Esq. ("Chiu Decl.") Ex. J, Morris 3/24/2006 Ltr. and enclosures; see also Pl. 56.1. ¶ 32; Lifranc Aff. ¶ 22, Ex. 17.) Three of the four letters, all dated March 14, 2006, detailed the Guidance Department's failure to effectively intervene or develop a plan of action to address the needs of three specific groups of students, specifically, the high numbers of (1) chronically truant students; (2) suspended students; and (3) students overage for their grade and not making progress toward graduation. (See Chiu Decl. Ex. J.) The fourth letter, dated March 20, 2006, discussed the Guidance Department's "persistent failure" to intervene or develop a plan of action to address the needs of students who had not been scheduled for mandated

---

[4]    Notably, after first testifying that he was responsible for the decision to remove Lifranc's duties, (Morris Dep. at 159), Morris later stated that he was not responsible for the decision and implied that the decision was made by German with his input (id. at 170-71.).

[5]    As discussed below, Lifranc took short term disability leave from March 7, 2006 through at least April 10, 2006. (Lifranc Aff. ¶ 20, Ex. 15.)

[6]    Lifranc had not previously received these letters because she had been on disability leave and had not been at Beach Channel since the day her duties were removed, or March 6, 2006. (Pl. 56.1 ¶ 32.)

testing.  (Id.)  Each of the four letters cited and discussed quantitative data regarding the numbers of at-risk students and the rate of response by Lifranc's department.  (See id.)

The packet also contained Lifranc's Pedagogical Supervisory Personnel Report dated March 24, 2006, for the 2005-2006 school year ("Lifranc 2005-2006 Ratings Sheet").  (See Chiu Ex. J.)  On the Lifranc 2005-2006 Ratings Sheet, Morris rated Lifranc "Unsatisfactory" for the 2005-2006 school year, stated that Lifranc had "not met expectations," and recommended discontinuance of Lifranc's probation.  (Lifranc Aff. ¶ 23, Ex. 18, Lifranc 2005-2006 Ratings Sheet.)  In the attached "Statement of Reasons," Morris identified the various areas – all previously cited in Morris's March Letters – in which Lifranc's performance as Assistant Principal of Personnel Services was deficient.  (Lifranc 2005-2006 Ratings Sheet.) Additionally, the Statement of Reasons faulted Lifranc for generally failing to provide the leadership and direction needed for a successfully functioning Guidance Department.  (See id.)

Additionally, Lifranc received a letter dated March 25, 2006 from German notifying Lifranc that on April 25, 2006 German would consider whether to discontinue Lifranc's probationary assignment as Assistant Principal based on the documentation contained in Lifranc's 2005-2006 Ratings Sheet and inviting Lifranc to file a written response.  (Lifranc Aff. ¶

24, Ex. 19; see also Chiu Decl. Ex. J, German 3/25/06 Ltr.)  In

response, Lifranc submitted two letters dated April 5, 2006 and

April 23, 2006.  (See Lifranc Aff. ¶¶ 25-26, Exs. 20-21; see

also Chiu Decl. Ex. Q, Lifranc 4/5/06 Ltr.; Chiu Decl. Ex. S,

Lifranc 4/23/06 Ltr.)  In her letter dated April 23, Lifranc

complained to German that there was "absolutely no way" for her

effectively to improve her performance because she had never

received the previous disciplinary letters (the Morris March

Letters) which had been sent at the same time she received the

unsatisfactory rating.  (Lifranc 4/23/06 Ltr.)

### d. Discontinuance of Lifranc's Probation

On April 25, 2006, Lifranc received a letter from

German discontinuing her service as a probationary Assistant

Principal, effective April 25, 2006.  (See Chiu Decl. Ex. M,

German 4/25/06 Ltr.; see also Lifranc Aff. ¶ 27, Ex. 22.)  Dr.

Kathleen Cashin, the Superintendent for Beach Channel's school

district during the relevant time period, testified as a general

matter that the school's principal had primary responsibility,

in conjunction with the Local Instructional Superintendent, for

determining whether or not an Assistant Principal would pass

probation.  (See Mars Aff. Ex. 6, Deposition of Dr. Kathleen

Cashin, July 15, 2008 ("Cashin Dep.") at 17, 22.)  By

recommending the discontinuance of Lifranc's probation and

discussing his recommendation with German, Morris had input into

the decision to discontinue Lifranc's probation.[7]  (Morris Dep. at 192-93.)

Subsequently, effective April 26, 2006, Lifranc's employment status was reverted to teacher, and she received a notice of salary adjustment that her salary had decreased from $80,053.00 to $50,683.00.  (Pl. 56.1 ¶¶ 26-27; Lifranc Aff. ¶¶ 27-29, Exs. 22-24.)  Another Beach Channel Assistant Principal, Robert Comer, who is a white male, was also removed from his position at Beach Channel for performance related reasons at another point in time.  (Morris Dep. at 46; Chiu Reply Decl. Ex. E, Morris 9/20/09 Ltr.)

After the responsibility for Pupil Personnel Services was removed from Lifranc, it was temporarily reassigned to Brevetti,[8] a white male Assistant Principal at Beach Channel. (See Pl. 56.1 ¶¶ 14, 19; Lifranc Aff. ¶ 17.)  The next school year, the Assistant Principal of Pupil Personnel Services position was permanently filled by Andrea Green, a black female

---

[7]    German testified that Morris never recommended Lifranc's discontinuance and that instead, it was German's decision alone that Lifranc should not be passed on her probation based on the results of the December 16th Assessment. (German Dep. at 35-36.)

[8]    Previously, while an Assistant Principal at Martin Van Buren High School in 2003, Brevetti had been disciplined for failing to abide by proper financial protocols.  (Pl. 56.1 ¶ 15.)  As a result of this disciplinary incident and pursuant to a stipulated settlement agreement, Brevetti's probationary appointment at Van Buren was terminated and he was required to serve another five-year probationary appointment as an Assistant Principal of Organization at Beach Channel.  (Id. at ¶ 16; see also Letter dated 4/1/2003, attached to Mars 5/29/09 Letter to the Court.)

who is not Haitian.  (Lifranc Dep. at 74; <u>see also</u> Pl. 56.1 ¶ 29.)

## C. Alleged Discrimination

Lifranc claims that she was discriminated against on the basis of her race, color, gender, and national origin by Morris and German.  (<u>See</u> Lifranc Dep. at 21-22.)  Lifranc does not claim that anyone else discriminated against her.  (<u>Id.</u> at 21.)  Lifranc is Haitian, black, and female, while Morris is black, male, and from Barbados.  (<u>Id.</u> at 22, 54.)  German is female.

Lifranc claims that Morris repeatedly made discriminatory comments about Lifranc's race, gender, and national origin, beginning around the time that he became principal of Beach Channel.[9]  (<u>Id.</u> at 22.)  Specifically, Lifranc claims that over the years around twenty times Morris called Haitians "rebels" and stated that Haitians "liked to fight." (Lifranc Dep. at 25-26, 29, and 50.)  Lifranc testified that Morris made these comments in the school hallways, his office, and in front of other Assistant Principals.  (Lifranc Dep. at 27, 49-50.)  However, Lifranc stated that at the time the comments were made, she thought that the comments were "made in jest."  (Lifranc Aff. ¶ 19.)

---

[9]     Morris denies ever making any discriminatory comments to Lifranc regarding her race, gender, or national origin.  (<u>See</u> Chiu Reply Decl. Ex. E, Morris 11/20/06 Ltr.)

On March 6, 2006, after Lifranc learned that her responsibilities had been transferred to Brevetti, she approached Morris in the Beach Channel lobby to ask him what had happened and he said to her: "Why do you Haitians like to fight so much?  I understand that you are a strong black woman, but you don't have to keep fighting.  You know Ms. Lifranc you kind of remind me of my first wife who was a black woman and like [sic] to fight and argue, that's why I left her and married a nice white woman, now I am happy."  (Pl. 56.1 ¶ 17.)[10]  Lifranc did not respond to the comment because she was in shock and humiliated, and she described the experience as one of the worst in her life.  (Def. 56.1 ¶ 31.)  Lifranc then returned to her office, started feeling heart palpitations, was admitted to the hospital the next evening for two nights and then out of work on disability leave for several weeks afterwards.  (Lifranc Aff. ¶¶ 19-20, 22.)

Lifranc claims that German discriminated against her because German relieved Lifranc of her duties.  (Lifranc Dep. at 66-67.)  Lifranc testified that German never made any discriminatory comment about Lifranc's race, color, national origin, or gender.  (Lifranc Dep. at 58.)  However, Lifranc believes that German possessed discriminatory intent against Lifranc because Morris told Lifranc that people "feel a white

---

[10]     Morris denies that this interaction took place.  (Morris Dep. at 166-167.)

man can do a better job than a black man." (Lifranc Dep. 53-54.) Aside from Morris' remark, Lifranc testified that she does not possess any other facts or evidence to support her claim that German discontinued Lifranc's probation because of Lifranc's race, color, national origin, or gender. (Lifranc Dep. at 56.) Lifranc does not allege any discriminatory intent on the part of Elliott or DePinto. (See Lifranc Dep. at 21.)

### D. Alleged Retaliation

On February 14, 2006, Lifranc wrote a letter to Dr. Edward Williams ("Williams"), President of the NAACP Rockaway Chapter. (Chiu Decl. Ex. I, Lifranc 2/14/06 Ltr.) Lifranc stated that she "realized her position was in jeopardy" at the time she wrote the letter to Williams. (Lifranc Aff. ¶ 16.) In the letter, Lifranc claimed that DePinto and Elliott had unfairly evaluated her because the two women "had a problem with [Lifranc] in the past" and because Lifranc was a "black woman in a high administrative position." (Lifranc 2/14/06 Ltr.)

Specifically, Lifranc described her view that DePinto was upset with Lifranc due to the 2002 incident when Lifranc hand-delivered a letter to Chancellor Klein criticizing a former Beach Channel principal, and that Elliot had harbored "a hostile attitude" towards Lifranc for years and had falsely claimed Lifranc had failed to attend required regional meetings. (Id.; see also Lifranc Dep. at 76-78, 91.) Lifranc testified that

Morris's comment to Lifranc that DePinto and Elliott were "on a witch-hunt" and "after" Lifranc, such that Lifranc "must have done something to them," supports her claim that DePinto and Elliott's unfair evaluation of her department was prompted by past personal problems. (Lifranc Dep. at 92.) In closing the letter to Williams, Lifranc stated that she feared she was being "set up" by "these women," namely, DePinto and Elliott. (Id.)

Williams sent a letter to Superintendent Cashin on March 21, 2006, in which he complained that Lifranc had apparently been subjected to "discriminate retaliatory" action by DePinto and Elliott. (Lifranc Aff. Ex. 16, Williams 3/21/06 Ltr.) Williams also commented that he believed the December 16th Assessment was suspect because it had been issued only four months prior to the conclusion of Lifranc's probationary period and there had never been any prior criticism of Lifranc's performance. (Id.)

Although the time-frame is unclear, Morris testified that he had been made aware that Lifranc made a complaint to the NAACP, but that he was unaware of how he had learned about it or the fact that she had written a letter. (Morris Dep. 147, 182-86.) German testified that she was aware of Lifranc's letter to the NAACP and that she had called and had a conversation with Williams about Lifranc's letter. (German Dep. 70-75.) In her April 5, 2006 letter to German, Lifranc also asserted that she

believed the Williams 3/21/06 Letter had further prompted defendants to retaliate against her and seek her termination.[11] (Pl. 56.1 ¶ 33; Lifranc 4/5/06 Ltr.)

**E. Procedural History**

On or about May 24 2006, Lifranc filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against the DOE (the "EEOC Charge") claiming that she was discriminated against because of her race, sex, and national origin when she was relieved of her duties as Assistant Principal on March 6, 2006. (Def. 56.1 ¶ 22.) The EEOC Charge did not allege retaliation. (See Chiu Decl. Ex. N, EEOC Charge.)

In her EEOC Charge, Lifranc explained that she had been discriminated against by Elliott and DePinto, and that her past problems with the two had led to the removal of her Assistant Principal duties. (Id.) Further, Lifranc stated her belief that it was DePinto who had suggested to German that Lifranc be removed from the school, and she described Morris'

---

[11] There is some confusion as to Lifranc's retaliation claim, both with respect to the alleged retaliatory act and the alleged retaliator. (See, e.g., Pl. Mem. at 24 n.10.) In her deposition, Lifranc alleged that DePinto and Elliott retaliated against her by unfairly evaluating her department. (Lifranc Dep. at 91-93.) Lifranc's 2/14/06 Letter to the NAACP similarly focused on her view that DePinto and Elliott retaliated against her. (See Lifranc 2/14/06 Letter, see also Pl. Mem. at 24 n.10 (noting "confusion" caused by Lifranc's "original focus" on DePinto and Elliott).) However, in her motion papers, Lifranc states that her retaliation claim is against German and Morris and based upon her 2/14/06 Letter to the NAACP. (See Pl. Mem. at 23-24; see also SAC ¶ 13 (alleging that plaintiff's adverse employment action is "in part, in retaliation for the complaints contained in" the Lifranc 2/14/06 Letter without identifying the alleged retaliator(s)).)

alleged discriminatory comments, made on March 6, 2006, the day her duties were removed. (Id.)

On December 27, 2006, the EEOC concluded that it was unable to determine whether defendant violated any anti-discrimination laws and issued a Notice of Suit Rights (the "Notice"). (Mars Aff. Ex. 1, Dismissal and Notice of Rights.) The Notice instructed that any lawsuit must be filed within 90 days of receipt of the Notice. (Id.) On March 15, 2007, Lifranc filed a *pro se* complaint initiating this action. (See Doc. No. 1, Complaint.) A Second Amended Complaint was eventually filed with the assistance of an attorney on October 16, 2007. (See SAC.) Following discovery, the instant motion ensued.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

The court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of

material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (citation and internal quotation marks omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not rest "merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); see also Harlen Assocs. v.

Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)

("[M]ere speculation and conjecture [are] insufficient to

preclude the granting of the motion.").

      "Employment discrimination cases raise special issues

on summary judgment."  Kenney v. New York City Dep't of Educ.,

No. 06-CV-5770, 2007 U.S. Dist. LEXIS 77926, at *7 (S.D.N.Y.

Oct. 22, 2007).  Specifically, employment discrimination cases

that involve a dispute concerning the "employer's intent and

motivation," may not be suitable for summary judgment.  Id.; see

also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

However, the Second Circuit has specifically cautioned "district

courts that the impression that summary judgment is unavailable

to defendants in discrimination cases is unsupportable."

Weinstock v. Columbia Univ., 224 F.3d 33, 44 (2d Cir. 2000)

(internal quotation marks and citations omitted); see also

Holcomb, 521 F.3d at 137 ("Even in the discrimination context,

however, a plaintiff must provide more than conclusory

allegations to resist a motion for summary judgment").

## II.  DISPARATE TREATMENT CLAIM

### A. Standard

      Lifranc's claims of discriminatory discharge based on

race, gender, and national origin pursuant to Title VII are

analyzed under the three-step burden shifting framework

established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792

(1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248

(1981).  Additionally, claims brought pursuant to 42 U.S.C. §

1983 and the state (NYSEL) and city (NYCHRL) human rights laws

are analyzed in accord with the standards governing Title VII

claims.  See Jessamy v. City of New Rochelle, 292 F. Supp. 2d

498, 511 n.15 (S.D.N.Y. 2003) (internal citations omitted) (§

1983 employment discrimination claims "evaluated under the same

analytical framework as those brought under Title VII"); Cruz v.

Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000)

(overruled on other grounds)(consideration of discrimination

claims brought pursuant to the NYSEL and the NYCHRL are analyzed

under Title VII framework) (citing Leopold v. Baccarat, Inc.,

174 F.3d 261, 264 n.1 (2d Cir. 1999) (New York state law) and

Landwehr v. Grey Adver. Inc., 211 A.D.2d 583, 622 N.Y.S.2d 17,

18 (N.Y. App. Div. 1st Dep't 1995) (New York City law)).

Accordingly, these claims will be addressed together.

        Under the Title VII framework, the plaintiff bears the

initial burden of establishing a *prima facie* case of

discrimination.  To establish a *prima facie* case, the plaintiff

must show that (1) she is a member of a protected class, (2) she

was qualified for her job, (3) she suffered an adverse

employment action, and (4) such adverse employment action

occurred under circumstances giving rise to an inference of

discrimination.  McDonnell-Douglas, 411 U.S. at 802-803.  The

Second Circuit has "characterized this burden as '*de minimis*:'

it is 'neither onerous, nor intended to be rigid, mechanized or

ritualistic.'"  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d

Cir. 2008) (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239

F.3d 456, 467 (2d Cir. 2001)).

If the plaintiff can establish a *prima facie* case, the

burden shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the alleged adverse employment action.

McDonnell Douglas, 411 U.S. at 802-803.  The employer's "burden

is one of production, not persuasion . . . and involves no

credibility assessment of the evidence." Pathare v. Klein, No.

06-CV-2202, 2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y. Sept.

12, 2008) (citations omitted).  At this stage, the employer

"must present a clear explanation for the action."   Id.

(citation omitted).

If the employer meets its burden, the plaintiff must

present evidence to show that the employer's reason is a mere

pretext for an impermissible discriminatory motive.  McDonnell-

Douglas, 411 U.S. at 804; McPherson v. New York City Dep't of

Educ., 457 F.3d 211, 216 (2d Cir. 2006).  In the summary

judgment context, this means the plaintiff must "establish a

genuine issue of material fact either through direct,

statistical, or circumstantial evidence as to whether the

employer's reason for its decision to discharge is false and as
to whether it is more likely that a discriminatory reason
motivated the employer to make the adverse employment decision."
Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d
1219, 1225 (2d Cir. 1994).

**B. Application**

### 1. Title VII Claims Against Morris Individually

Defendants argue that Lifranc's Title VII claims must
be dismissed as to defendant Morris because Title VII claims
cannot be maintained against individual defendants. (Def. Mem.
at 13-14.) Lifranc effectively concedes this point, while
maintaining that Morris may be held individually liable under
the New York State Human Rights Laws. (Pl. Mem. at 28-29.)

It is well settled that an employer's agents, even
those in supervisory positions, cannot be held individually
liable under Title VII. See Tomka v. Seiler Corp., 66 F.3d 1295,
1312-13 (2d Cir. 1995), abrogated on other grounds by,
Burlington Indus. Inc. v. Ellerth, 524 U.S. 742; Mandell v.
County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003).
Accordingly, the Title VII claims must be dismissed as to
defendant Morris.

## 2. Discrimination Claims Against DOE

### i. Plaintiff's Prima Facie Case of Discrimination

Defendants contend that Lifranc has failed to establish a *prima facie* case of discrimination but contest her showing under only the fourth factor, (see Def. Mem. at 4), and assert that Lifranc has failed to demonstrate circumstances surrounding the adverse employment action giving rise to an inference of discrimination. See, e.g., Collins v. New York City Transit Autho., 305 F.3d 113, 118 (2d Cir. 2002). Lifranc asserts that she has met the minimal burden of establishing a *prima facie* case because as evidenced by his comments, Morris possessed a discriminatory animus towards black, Haitian women, and he had a significant role in the adverse employment action against Lifranc. Defendants base their objection on three separate grounds.

First, defendants assert that Lifranc's claim that she was relieved of her duties and lost her probationary Assistant Principal status because of discrimination by her principal, Morris, is defeated because Morris was not the final decision-maker. (Def. Mem. at 4-5.) Rather, according to defendants, German, the Local Instructional Superintendent, made the final decisions regarding Lifranc's duties and probationary status and Lifranc has admitted that German never made discriminatory

comments to Lifranc regarding her race, color, gender, or national origin.  (Id. at 5.)

Defendants' first argument fails both on the facts and the law.  First, construing the facts most favorably to Lifranc, as the court must, it is clear that German did not make the final decisions regarding Lifranc's duties and probationary status without consultation from Morris.  Indeed, Morris at one point in his deposition took responsibility for the decision to remove Lifranc's duties, and he also acknowledged his input into the decision to discontinue Lifranc's probationary status. (Morris Dep. at 159, 192-93.)  Further, Cashin testified that the school's principal had primary responsibility for determining whether an Assistant Principal would pass probation. (Cashin Dep. at 17, 22.)  Under such circumstances, and assuming for present purposes, as alleged by Lifranc, that Morris possessed discriminatory animus, the fact that German was ultimately the final decision-maker does not defeat Lifranc's prima facie case.  See, e.g., Browne v. CNN America, Inc., No. 99-9494, 2000 U.S. App. LEXIS 25480, at *4 (2d Cir. Oct. 6, 2000) (implicitly noting plaintiff's showing of a prima facie case where plaintiff's immediate supervisor (who allegedly possessed discriminatory animus) had input into adverse employment action completed by another individual who made the final termination decision).

28

Second, defendants assert that it is "less likely" that plaintiff suffered an adverse employment action based on discrimination because the decision-maker – German – is in the same protected category as Lifranc because they are both female. As discussed above, the facts construed most favorably to Lifranc suggest that German was not the sole decision-maker. Moreover, Defendants fail to recognize that the Second Circuit has unequivocally stated that "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." See Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998). Finally, even assuming that German's decision-making role did make it "less likely" that Lifranc was discriminated against, this weak showing does not negate Lifranc's *de minimis* burden to establish a *prima facie* case. See, e.g., Beyer, 524 F.3d at 163 (noting minimal burden to establish *prima facie* case).

Third, defendants contend that because Lifranc was eventually replaced by Andrea Green, a black female, a reasonable juror could not infer discrimination against Lifranc when Lifranc was replaced by someone from within the same protected class. (See Def. Mem. at 5.) Lifranc counters that she is claiming discrimination on the basis of her race, gender, *and* national origin, and she notes that although Green is black and female, she is not Haitian like Lifranc. (See Pl. Mem. at

29

14.) As such, it appears that Lifranc is asserting a type of "gender plus"[12] claim in which she is claiming that she faced discrimination based on race-plus-gender-plus-national origin. See, e.g., Gorzynski v. Jetblue Airways Co., 596 F.3d 93, No. 07-4618-cv, 2010 U.S. App. LEXIS 3424, *42-43 (2d Cir. Feb. 19, 2010). The Second Circuit has "recognized that a plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets." See id.

Thus, each of defendants bases for contesting plaintiff's *prima facie* case fail. As noted, the burden of establishing a *prima facie* case is not a heavy one in the Second Circuit – and it has been met here. See, e.g., Beyer, 524 F.3d at 163.

### ii. Defendant's Legitimate, Non-discriminatory Reasons for the Adverse Employment Action

Accordingly, the burden shifts to defendants to present a legitimate, nondiscriminatory reason for removing Lifranc's job responsibilities and eventually discontinuing

---

[12] "The term "gender plus" (or "sex plus" as it is more commonly known) refers to a policy or practice by which an employer classifies employees on the basis of sex *plus* another characteristic. In such cases the employer does not discriminate against the class of men [or] women as a whole but rather treats differently a subclass of men or women." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 119 n.7 (2d Cir. 2004) (internal quotations and citations omitted) (emphasis in original).

Lifranc's probation.  See McDonnell Douglas, 411 U.S. at 802-03.

Defendants contend that they terminated Lifranc because of her

poor job performance and point to several pieces of evidence

supporting their rationale.

First, defendants note that during the December 16th

Assessment, DePinto and Elliott identified serious deficiencies

with Pupil Personnel Services, an area for which Lifranc was

responsible, and which scored an average of 1.5 placing it in

the category of "not meeting standards."  (See December 16th

Assessment Rubric; see also DePinto Dep. 34-35.)  The December

16th Assessment also noted problems with the lack of

individualized plans for students and lack of follow-up and

interventions for students exhibiting serious behavior problems.

(See December 16th Assessment Rubric.)

Additionally, following the December 16th Assessment,

both Morris and Elliott warned Lifranc that she needed to

correct the deficiencies identified in the December 16th

Assessment.  (See Morris 2/1/06 Ltr.; Elliott 2/13/06 Ltr.)

Morris directed Lifranc that, among other things, Lifranc needed

to create a guidance plan, ensure her staff was helping students

make yearly progress towards meeting promotion standards, work

with the Parent Coordinator to facilitate delivery of

suspension-related services, work with Brevetti to coordinate

programming and attendance outreach, and regularly send notices

to parents about school events and schedules. (Morris 2/1/06 Ltr.)

Elliott's letter specifically detailed the findings of the December 16th Assessment and reminded Lifranc of recommendations for improving Lifranc's performance which had been previously discussed with Lifranc on December 16th, 2005, including the need for Lifranc to guide her staff to ensure delivery of mandated services to students in need, outreach to parents of chronically disruptive students, service as advocates for students in the suspension process, and lesson presentations in classrooms. (Elliott 2/13/06 Ltr.) Additionally, Elliott's letter discussed the need for Lifranc to personally utilize professional development opportunities offered by OSID as well as to provide professional development to her staff. (Id.) Finally, Elliott warned Lifranc that failure to improve could result in a rating of "Unsatisfactory" performance. (Id.)

After approximately a month, during which German continued to review Lifranc's performance without noticing any improvement, on March 6, 2006 German and Morris decided to remove Lifranc's duties. (See Morris Dep. 192-93; German Dep. 35-38; German 4/25/06 Ltr.). Morris subsequently documented additional ongoing issues with Lifranc's department, including problems addressing the needs of chronically truant students,

suspended students, and overage students who were not making progress toward graduation.  (See Morris March Letters.)

Defendants' proffered rationale for the decision to discontinue Lifranc's probation based on poor performance constitutes a legitimate, non-discriminatory reason for the employment action.

### iii. Pretext

As a result, the burden shifts back to plaintiff to establish a genuine issue of fact, through admissible evidence, as to whether the employer's presumptively valid explanation was merely a pretext for discrimination.  McDonnell-Douglas, 411 U.S. at 804.  This opportunity to raise an issue of fact as to whether the employer's proffered reason was pretextual merges with plaintiff's ultimate burden of presenting admissible evidence that she was more likely than not a victim of intentional discrimination in that an "illegal discriminatory reason played a motivating role in the adverse employment decision."  See Bickerstaff v. Vassar College, 196 F.3d 435, 447 (2d Cir. 1999).  Thus, a Title VII plaintiff "may not prevail by establishing only [the falsity of a defendant's proffered reason], but must prove, in addition, that a motivating reason was discrimination."  Id. at 447 n.5 (internal citations omitted).

Lifranc cites three grounds to support a finding that
defendants' explanation is pretextual: (1) defendants' use of
the December 16th Assessment as the basis for its decision to
discontinue Lifranc was not "tenable" because the Assessment was
never intended to be evaluative; (2) Morris's repeated comments
regarding Lifranc's race and national origin reveal a deep-
seated discriminatory animus on the part of Morris against
Lifranc making it more likely than not that he recommended
Lifranc's discontinuance because of a discriminatory reason; and
(3) Brevetti, a white male Assistant Principal at Beach Channel,
was treated dissimilarly from Lifranc although he was similarly
situated to her.  (Pl. Mem. at 15-19.)  Lifranc's claims of
pretext fail to raise a genuine issue of fact on each ground.

## 1. Alleged Deviation from Standard Practices

First, the record contradicts Lifranc's assertion that
the December 16th Assessment could not properly serve as a basis
for the adverse employment action at issue here.[13]  Although
Lifranc correctly points out that "deviations from standard
practice" may raise questions of good faith and support an
inference of pretext, (Pl. Mem. at 15), she fails to identify
any facts in the record to show that defendants' reliance on the
December 16th Assessment in deciding to remove Lifranc's duties

---

[13]    Additionally, as discussed further *infra*, the court notes that the
record, taken as a whole, contains other bases relied upon by defendants in
making the adverse employment decision in addition to the December 16th
Assessment.

as Assistant Principal constituted a deviation from standard
practice.  Rather, relying solely on a statement by DePinto that
the December 16th Assessment as a whole was not meant to be
"evaluative," Lifranc makes a leap unsupported by the record
when she concludes that the use of data from the Assessment was
an improper deviation from standard DOE or Beach Channel
procedure.  (See Pl. Mem. at 15 (citing Pl. 56.1 ¶ 28).)

        Aside from DePinto's single remark taken out of
context, Lifranc identifies no other evidence to support her
assertion that the defendants' use of the Assessment was a
deviation from standard procedure.  (See Pl. Mem. at 15-16.)
However, viewed in context, it is clear that DePinto's testimony
about the non-evaluative nature of the December 16th Assessment
merely referred to the fact that it was not DePinto's "role" to
evaluate the Assistant Principals.  (DePinto Dep. at 47.)  Thus,
DePinto's testimony provides no support for the proposition that
reliance on the Assessment as a basis for the decision to remove
Lifranc's job responsibilities as an Assistant Principal was a
deviation from standard DOE or Beach Channel procedure.  (See
id.)  Instead DePinto testified that she was unaware of how a
principal, the direct supervisor of any Assistant Principal,
might utilize the Assessment in an evaluation because she had
never discussed that issue.  (See id. at 46-47.)  Additionally,
DePinto testified that a purpose of the Assessment was to permit

35

a school principal to identify strengths and weaknesses in the school and create an action plan to address underperforming areas. (See Pl. Mem. at 23.) Absent any evidence to the contrary, any reasonable trier of fact could reasonably conclude that such an action plan could include permissibly relying on the Assessment to remove any employees identified as underperforming through the Assessment.

As such, this record is clearly distinguishable from the cases cited by Lifranc in which courts found an inference of pretext and discrimination created by "unprecedented" deviations from demonstrated "usual procedures." See, e.g., Stern v. Trustees off Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (discussing inference of pretext arising from University's decision made with "unusual rapidity" to summarily appoint a candidate to position "without following any of its usual procedures" and the "unprecedented appointment" of an "atypical" search committee).

### 2. Alleged Discriminatory Remarks by Morris

Second, taking as true Lifranc's allegations that Morris made discriminatory comments to her,[14] Lifranc nonetheless

---

[14]     The court agrees with plaintiff that by attacking Lifranc's credibility and the veracity of her allegations concerning Morris's alleged discriminatory comments, (see Def. Reply Mem. at 3-5), defendants simply raise an issue of fact. (See Pl. Mem. at 18.)  The court disregards these credibility attacks and notes that its analysis proceeds instead by assuming, without deciding, and for purposes of this motion only, that all of plaintiff's allegations regarding Morris's conduct are true.

fails to demonstrate the required nexus between the alleged comments and the adverse employment action.  See, e.g., Vilien v. Dep't of Educ. of the City of N.Y., No. 06-cv-3491, 2009 U.S. Dist. LEXIS 27468, *12 (S.D.N.Y. Mar. 31, 2009) ("It is well established that stray remarks without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment.") (internal quotation and citation omitted).

According to Lifranc, Morris's allegedly discriminatory comments primarily included: (1) beginning at the outset of his tenure as principal, remarking to Lifranc around twenty times over the years that Haitians are "rebels," ("2003-2006 Comments"); and (2) on March 6, 2006, after Lifranc's duties as Assistant Principal were removed and reassigned to Brevetti, remarking to Lifranc: "Why do you Haitians like to fight so much?  I understand that you are a strong black woman, but you don't have to keep fighting.  You know Ms. Lifranc you kind of remind me of my first wife who was a black woman and liked to fight and argue, that's why I left her and married a nice white woman, now I am happy." ("3/6/06 Comment").  (See Pl. Mem. at 16-17.)

Lifranc contends that these comments reveal a "deep-seated discriminatory animus against Lifranc" on the part of Morris, rendering it "more likely than not that" such animus

motivated Morris's decision to recommend the removal of Lifranc's duties as Assistant Principal and termination of her probation. (Pl. Mem. at 17.) Although Lifranc characterizes the comments as discriminatory because they necessarily "imply[] that Haitians were naturally combative," the court notes at the outset that the 2003-2006 Comments are themselves ambiguous and susceptible to a non-discriminatory interpretation, as Lifranc admits. Indeed, it appears that plaintiff herself had previously interpreted the 2003-2006 Comments in a non-discriminatory light, noting that she "had believed that those prior comments were made in jest." (See Lifranc Aff. ¶ 19.) However, Lifranc states that after the 3/6/06 Comment she "realized" that Morris "had been serious about his contempt for Haitian women." (Id.)

More importantly, however, Lifranc does not dispute that prior to the 2005-2006 school year, Morris had both consistently rated Lifranc's performance satisfactorily, as well as taken the initiative to prepare and file various praise-worthy and congratulatory letters in Lifranc's personnel file. (Morris Dep. at 7, 84-95) Further, after the December 16th Assessment and Morris's 2/1/06 letter to Lifranc's file regarding the need for her to correct the deficiencies identified in the Assessment, Lifranc herself noted in her 2/7/06 letter that Morris had on "many different occasions"

commented on how hard Lifranc has been working at Beach Channel.
(Lifranc 2/7/06 Ltr.) Morris's past, repeated, favorable
employment decisions regarding Lifranc strongly undermine any
potential inference of bias from the comments. It is difficult
to infer that Lifranc's race, gender, and national origin
suddenly motivated Morris to contribute to an adverse employment
decision regarding Lifranc just months after his unprompted
favorable decisions regarding Lifranc. See, e.g., Chuang v.
T.W. Wang Inc., 647 F. Supp. 2d 221, (E.D.N.Y. 2009) ("It is
difficult to impute bias against a plaintiff in a protected
class where the person making the adverse employment decision
also made a recent favorable employment decision regarding the
plaintiff.") (citing Grady v. Affiliated Cent., Inc., 130 F.3d
553, 560 (2d Cir. 1997) cert. denied, 525 U.S. 936 (1998).

Thus, the close temporal proximity of Morris's
previous favorable employment decisions regarding Lifranc are
inconsistent with bias, and "strongly suggest that invidious
discrimination was unlikely" in connection the adverse
employment decision here. See Grady, 130 F.3d at 560
(unlikelihood of invidious discrimination "especially so" when
the adverse employment decision occurred "only a short time
after" favorable employment decisions). Similarly, but in the
converse, the mere fact that Lifranc had received such favorable
ratings in the past does not alone raise an inference of

pretext.  See, e.g., Godfrey v. Ethan Allen, Inc., No. 96-7978,
1997 U.S. App. LEXIS 12334, *5 (2d Cir. May 23, 1997) (noting
that prior positive evaluations alone fail to establish that
later unsatisfactory evaluations are pretextual).

Moreover, notwithstanding the prior "Satisfactory"
ratings Lifranc had previously received, defendants' undisputed
evidence of Lifranc's poor performance in the 2005-2006 school
year render the "stray remarks" by Morris insufficient to create
a triable issue of fact as to pretext.  First, Lifranc herself
acknowledges that the December 16th Assessment was the "basis"
for the adverse employment discrimination here.  (See Pl. Mem.
at 15.)  However, Lifranc cites no evidence to suggest that the
independent preparers of the December 16th Assessment – DePinto
and Elliott – were themselves motivated by any discriminatory
animus against Lifranc based on her race, gender, or national
origin.  In fact, to the contrary, despite alleged past
"personal" issues with the two women, Lifranc testified to the
effect that DePinto and Elliott did not discriminate against her
on the basis of a protected ground.  (See Lifranc Dep. at 21
(identifying German and Morris as the only individuals whom
Lifranc believes discriminated against her).)  Additionally,
DePinto testified that she had never discussed Lifranc's job
performance with Morris prior to conducting the December 16th
Assessment, ((DePinto Dep. at 52), and there is no evidence that

Elliott had done so either. Thus, even assuming discriminatory animus existed on the part of Morris, there is no basis to infer that Morris improperly tainted or influenced the December 16th Assessment regarding Lifranc, which was the undisputed basis for the adverse employment action.

Further, the neutrally prepared December 16th Assessment documents a litany of serious issues with Lifranc's performance. (See December 16th Assessment Rubric.) Specifically, the Assessment reflected the failure of Lifranc and her subordinates to meet the social, emotional, and academic needs of the Beach Channel student community and particularly the needs of those students exhibiting serious behavioral issues or in danger of not graduating. (See id.) Additionally, Elliott's February 13th letter to Lifranc recapped the problems identified with Lifranc's department as previously discussed by Elliott and Lifranc during the December 16th Assessment, concluded that Lifranc's performance thus far for the 2005-2006 school year had been "unsatisfactory," and further reiterated the recommendations previously provided to Lifranc for improvement. (See Elliott 2/13/06 Ltr.) Finally, the Morris March Letters and the Statement of Reasons accompanying Lifranc's 2005-2006 Ratings Sheet, also relied upon by defendants, further document serious problems in Lifranc's department based upon unrefuted quantitative data. (See Morris

March Letters; _see also_ Lifranc 4/5/06 Ltr. and Lifranc 4/23/06 Ltr. (noting previous satisfactory evaluations but nowhere disputing accuracy of quantitative data relied upon in Morris March Letters).)

The ambiguous, stray remarks by Morris, considered in the context of the strong evidence of Lifranc's poor performance and Morris's prior positive evaluations, are insufficient to support a conclusion by a rational trier of fact that defendant's proffered non-discriminatory basis for removing Lifranc's duties was pretextual. _See, e.g._, _De La Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs._, 884 F. Supp. 112, 116 (S.D.N.Y. 1995), _aff'd_ 82 F.3d 16 (2d Cir. 1996) (granting employer's motion for summary judgment notwithstanding stray racial remarks in light of employee's poor performance and "numerous and critical errors"); _see also_ _O'Connor v. Viacom Inc._, No. 93-cv-2399, 1996 U.S. Dist. LEXIS 5289, *13-15 (S.D.N.Y. Apr. 23, 1996) _aff'd_, 1996 U.S. App. LEXIS 32986 (2d Cir. Dec. 16, 1996) (stray remarks evidencing national origin discrimination insufficient to establish pretext in light of plaintiff's documented deficient job performance) (collecting cases).

### 3. Disparate Treatment from Allegedly Similarly Situated Employees

Third, Lifranc has failed to demonstrate that she was similarly situated to Brevetti in "all material respects" and therefore no inference of disparate treatment, pretext or discrimination arises from this ground.  See, e.g., Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000).  In fact, Lifranc fails to offer any evidence that she is similarly situated to Brevetti.  In contrast to Lifranc, Brevetti was disciplined at a different time than 2006 (2003), by different decision-makers than Morris and German (Deputy Superintendent Gerard Beirne and Superintendent John W. Lee), at a different DOE school than Beach Channel (Martin Van Buren High School), on the basis of a different issue than poor performance (alleged misuse of a per session budget).  (See Def. Reply Mem. at 7; see also Report dated April 1, 2003, annexed to Lifranc's May 29, 2009 Letter to the Court.)  Lifranc cannot demonstrate that she and Brevetti are "similarly situated in all material respects" on these facts and accordingly, no rational fact finder could infer discriminatory animus or disparate treatment on the grounds that Brevetti's probation was extended while Lifranc's was not.

Considering each of the three areas identified by Lifranc and the record taken as a whole, no reasonable trier of

fact could conclude that defendants' nondiscriminatory explanation for Lifranc's discharge was pretext and that an illegal discriminatory animus was the motivating factor behind the decision to remove Lifranc's responsibilities and discontinue her probation.  Therefore, defendants are entitled to summary judgment on Lifranc's discrimination claims under Title VII, and this holding applies with equal force to Lifranc's claims under § 1983 and the State and City Human Rights Laws.[15]  See Jessamy, 292 F. Supp. 2d at 511 n.15 (§ 1983); Cruz, 202 F.3d at 565 n.1 (NYSEL and NYCHRL).

## III.  RETALIATION CLAIM

### A. Standard

Retaliation claims under Title VII are also examined under the same McDonnell Douglas burden-shifting framework utilized for disparate treatment claims.  See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003).  Retaliation claims under the NYSEL and NYCHRL, like discrimination claims, are also governed by the same standards as federal claims under Title VII.  See Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006).

---

[15]     Because the court grants summary judgment to defendants on the merits of Lifranc's discrimination claims, it declines to address defendants' alternative arguments for summary judgment related to municipal liability, qualified immunity, and failure to file a notice of claim. (See Def. Mem. at 12-15.)

A plaintiff makes a *prima facie* showing of retaliation by establishing that (1) she participated in a protected activity known to the defendant; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995) abrogated on other grounds, Burlington Indus., 524 U.S. 742. To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* discrimination case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101 (2003).

Once a plaintiff has satisfied her *prima facie* burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. See Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back to plaintiff to demonstrate that the reasons proffered by defendant were a pretext for retaliatory animus based upon protected Title VII activity. See Sista v. CDC Ixis N. Am. Inc., 445 F.3d 161, 169 (2d Cir. 2006); EEOC v. Thomas Dodge Corp., No. 07-CV-988, 2009 U.S. Dist. LEXIS 24838, at *38 (E.D.N.Y. Mar. 25, 2009).

**B. Application**

As an initial matter, the court rejects defendants' argument that the court lacks jurisdiction over Lifranc's retaliation claim. Defendants' reliance on Butts v. City of New York, 990 F.2d 1397 (2d Cir. 1993) is misplaced. Although a District Court cannot generally hear unexhausted discrimination claims, the Butts court recognized three types of claims which may be brought in a civil action – although unexhausted – because they are "reasonably related" to the allegations included in a previously filed EEOC charge. See id. 990 F.2d at 1402. One type of "reasonably related" claim recognized by Butts is one "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" in the EEOC charge. See id.

Here, there is no dispute that Lifranc's EEOC Charge did not include her claim of retaliation on its face. (See Pl. Mem. at 22.) However, the retaliation claim here is "reasonably related" to the claims set forth in Lifranc's EEOC Charge because the facts involved were included within the original charge and therefore "within the scope" of the initial EEOC investigation reasonably expected to grow from Lifranc's charges of discrimination. See Butts, 990 F.2d at 1402. Accordingly,

the court has jurisdiction over Lifranc's retaliation claim.
However, the retaliation claim fails on the merits.

In her Complaint, plaintiff alleges no specific facts
regarding her alleged retaliator. (See SAC ¶ 13.) In her
Memorandum of Law on the instant motion, Lifranc disavows any
retaliation claim against DePinto and Elliott, and instead
states that her retaliation claim is against German and Morris
and is premised upon the Lifranc 2/14/06 Letter to the NAACP
complaining of discrimination.[16] (See Pl. Mem. at 23-24.)
Specifically, Lifranc asserts that German and Morris decided to
remove Lifranc's responsibilities as Assistant Principal on
March 6, 2006 in retaliation for Lifranc's 2/14/06 Letter to the
NAACP approximately two weeks earlier complaining that she was
"being harassed and targeted as a black woman in a high
administrative position." (See id. at 23-27.)

Assuming without deciding that Lifranc has established
a *prima facie* case of retaliation,[17] the burden shifts to
defendants to articulate some legitimate, non-discriminatory
reason for its actions, and then back to plaintiff to prove by a
preponderance of the evidence that the legitimate reasons

---

[16]    Ironically, the Lifranc 2/14/06 Letter to the NAACP itself, which
Lifranc now claims is the basis for her retaliation claim against German and
Morris, accused DePinto and Elliott of retaliation, but not Morris or German.
(See Lifranc 2/14/06 Letter.)

[17]    The court notes that defendants raise potentially valid arguments on
the issue of plaintiff's *prima facie* case.

offered by the defendant were merely a pretext for retaliation. See Sista, 445 F.3d at 169.

First, as discussed at length *supra*, defendants have proffered detailed evidence demonstrating a legitimate, non-retaliatory basis for the removal of Lifranc's Assistant Principal duties – namely, her poor performance. This record forecloses any rational inference that Lifranc's job performance during the 2005-2006 school year was satisfactory.

Second, Lifranc is unable to rebut the inference that her performance was unsatisfactory and the reason for her removal was retaliation given the undisputed timing of events. Lifranc's 2/14/06 Letter was written *after* defendants had already well-documented the serious deficiencies in the areas for which Lifranc was responsible in the December 16th Assessment as well as in Morris's 2/1/06 letter (noting the critical need for Lifranc to address serious deficiencies in her department) and Elliott's 2/13/06 Letter (warning Lifranc that continued unsatisfactory performance could result in an unsatisfactory rating). Additionally, Lifranc stated that at the time she sent the letter to the NAACP, she already knew that her position was in jeopardy. (Lifranc Aff. ¶ 16.) Moreover, Lifranc does not dispute German's testimony that Lifranc was given approximately a month after Morris's 2/1/06 letter to

correct the identified deficiencies in her performance, but failed to do so.  (German Dep. at 92-95.)

Thus, the critical decisions leading to the ultimate removal of Lifranc's responsibilities predated her 2/14/06 letter to the NAACP, which Lifranc claims was the catalyst for defendants' retaliation.  This record further precludes any rational inference that Lifranc's 2/14/06 letter to the NAACP played any part in her supervisors' determination *prior* to her 2/14/06 letter that her performance was deficient and could potentially result in adverse employment actions.  See, e.g., Khan v. Abercrombie & Fitch, Inc., No. 01-cv-6163, 2003 U.S. Dist. LEXIS 16329 *29 (S.D.N.Y. Sept. 16, 2003) (granting summary judgment for employer on retaliation claim where employer offered "a legitimate, non-retaliatory basis for [plaintiff's] termination that [plaintiff was] unable to rebut").  Accordingly, Lifranc's retaliation claims under federal, state, and city law cannot withstand defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby granted in its entirety. The Clerk of Court is respectfully requested to enter judgment in defendants' favor, and to close this case.


SO ORDERED.


Dated: Brooklyn, New York
       April 6, 2010

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York
